The next matter, number 191056, T-Force, Dagi, MD v. Delta Airlines, Inc. May it please the Court, I'm Henry Herman, Counsel for the Plaintiff Appellant, Dr. Theo Dagi, in this case. Before I begin, may I request that I be allowed two minutes of my allotted time for rebuttal? Yes. Before I address the central legal issue, I would briefly like to focus at the beginning on what I think are the crucial facts, because I say that they really control the case. This passenger, Delta Airlines, was imprisoned by Delta Airlines on the gateway leading into the terminal, and in the terminal he was conducted by a Delta employee to a location. He wasn't just randomly walked around like in some other cases. He was conducted to a specific location, 400 yards away from the airfield. That's about four football fields, and just about exactly what this court in the Martinez-Hernandez said was a minimum range in that case that would constitute a sufficient distance from the plane to constitute disembarkation. The second issue is he was detained at the second location, counting the time when he exited the aircraft and the duration of the location that he was taken to before they marched him back to the aircraft. A total of half an hour had elapsed. Why do I stress that? This court, in both the Martinez-Hernandez cases and in the McCarthy cases, has stressed, and I quote, a close tie with the flight itself, a close relationship spatially and temporally with the aircraft. I think that it is worthwhile considering, before we look at the legal issue of whether he had legally disembarked, and of course the Delta's position and the District Court's position is, all that notwithstanding, he had not legally disembarked because he was under the control of the airline. But before we reach that legal point, please consider that other than the issue of control, which I'll get to in a second, he has met all the requirements of the so-called triad test. So we have time, we have location, the next one element of the triad test is activity. This court, in the Martinez-Hernandez case, held that the activity problem was satisfied on the following grounds. The court said, we are satisfied that the passenger has no more physical activities necessary to part himself from the aircraft, to move away from the aircraft. Again, I submit, Your Honor, that 400 yards away, half an hour off the plane, if he has not yet, quote, physically separated himself from the aircraft by any standard, then we're moving into a different paradigm or dimension. Now as to control, of course that's been argued back and forth in the District Court and in the briefs before, Your Honor. Let's look at control. There's two issues about control that I think are paramount. The first is, what is the role of control in this triad test? First, this court again, in the McCarthy case, has explicitly said that the control element cannot render the other elements of this test prong, quote, inoperative, because otherwise it would make the other elements of the test prong, quote, a fraud. It couldn't be said more strongly. Now, the second point is, why of all the test prongs should control be afforded this sudden, dispositive, destructive almost, role over the other test prongs? Again, to quote this court, in the Martinez-Hernandez case, the court said, The relevance of control as opposed or as in contrast to activity and location may not be as apparent from the text or drafting history of the Convention. So I suggest that of all the control, all the prongs of this test to be afforded this kind of dominant role that it can render the other elements meanless, as Delta Orr argues, I think is misplaced. And then finally, I'd like to focus on the issue of types of control. I argued below, and in the brief submitted to this honorable court, that the drafters of the Convention and the signatories thereto were focusing on what can go wrong in an airline. The whole idea of this Convention schema was to insulate what was then called a growing industry from these vagaries and risks. They were not, if control is relevant at all, in the same measure as the other prongs. No drafter, I think, and no signatory was thinking of tortious behavior in the terminal long after the passenger has departed. Now, the district court at great length and eloquently said that appellate, plaintiff, was trying to make a lexicographic error in saying that different meanings of the word control. And that was well said. But my argument is not that control has different meanings. It's different. My argument is, the question is, what is the exercise of the control? How is it being exercised and for what purpose? I think what the control element traditionally meant was, if an airline attendant says, get on line here, getting off, or go through that gate, or go in that direction to customs, that's the kind of control they were thinking of. Not when they grab this passenger and hold him for an hour. Now, with all respect to the district court, I think there's a subtle but fundamental contradiction in this decision. And it is this. He says that control means control, almost Bertrude Stein like. What's the meaning of control? There's control. But please consider that the whole reason the trial court said that control was the distinctive element here, because he remained under control long after the half hour and long after the location 400 yards away, is because it is the very element of the tort. So the trial judge is really saying, in response to a comment I made, being all argument, just give me a second please. Yes, look at appendix page 134. I said it comes down to your honor whether the court thinks that control can trump all the other factors. And the court said, more or less paraphrasing, usually, probably not. But here it is the element of the tort. So what do we have here? Oh, and in addition, Delta has admitted in a question, on all arguments to the district court, that in the ordinary course of events, the airline would not even have control. In other words, that Dr. Dyding, in the ordinary course of events, walking off the jetway, would not have been under control of the airline. That would be at appendix 144. So, the only reason control is controlling here, quote unquote, is because it's tortious. Does that make sense? If it's routine control, it would not affect the other prime factors, and he would have legally disembarked. But if it's a tortious control, then it trumps the other factors. I suggest that just doesn't make sense. This, I think, relates to the issue of continuing torts. Hello? Right here. This relates to the issue of continuing, being a continuing violation, and this idea of splitting claims. So could you just address that? Because the unusual feature here, or at least a feature that's causing the dispute. I'm sorry, Your Honor. I'm not understanding. I'm very hard of hearing. Okay. I'll say it a little bit louder. Can you hear this? Yes, sir. Okay. I think your last point goes to the issue that here we're dealing with a continuing violation. A continuing tort, yes, sir. Yes. So, I've had trouble finding precedents that tell me what to do with a continuing tort. So it begins in a location and at a place and with control in circumstances that even you seem to concede would fall within the convention and therefore be preempted. In other words, is the court asking, is your Honor asking me what is the, how does a continuous tort in this situation manifest itself? I'm asking how do we deal with the preemption question with respect to a continuing tort, given that you concede that part of it is probably preempted because it had to do with disembarkation. And the question is, the nature of the tort manifests itself in a way in which the only thing that changes is that the reason for having seized the person doesn't change. In the eyes of Delta, they still want to hold him. They just physically have now taken him to a new location and time has passed until some authority can get there to get hold of the person. Their argument seems to be because of that, we should view it as all unified and anchored at the beginning. You're saying, no, we can look at it at each moment. And there becomes a magical moment when he's now no longer plausibly said to be disembarking. And at that point, the part of the tort, the violation that fell within the disembarkation, that's preempted. But what remains is free to go. So is there any case law that helps me deal with that circumstance where I'm dealing with a continuing tort that begins in a place where you would concede there would be preemption, but it extends past that time and then courts have said, well, now it's too far away. Yes, you are. There is indeed such a case. And we dealt with it at length in the district court. It is Elna Jaw. I couldn't spell it when I was asked by the district court. I can't spell the name now, but it's Elna Jaw versus an airline. And in that case, my time is up. May I answer? Yes. In that case, the defendant, I'm sorry, the plaintiff was arrested on the aircraft. He was removed from the aircraft by the Federal Secret Service agents and was taken off the aircraft by them and an agent of the airline. He was marched around the terminal at great length. Sounds like Dr. Doggett to some extent. It said Dr. Doggett was taken to a specific location. Now, the district judge, in a very careful decision, citing and quoting the decisions of this court, dealt with it as follows. He said the unlawful imprisonment action was not preempted after he had reached a certain distance from the aircraft. He did exactly what I'm asking this court to do, to look at it in a bifurcated situation. The element that was during the disembarkation is clearly preempted. But at some point, when he's far enough from the aircraft and enough time has elapsed, and in that issue, the control aspect didn't come up in that case because the court said, well, the airline is not the only one controlling it. But as far as splitting it, Your Honor, or rather saying there's a distinction between these two temporal phases, the Eleger Court did exactly that. And one more thing, if you look at the local law, which we say applies at least to the element of liability, not damages, British law, the British Law Commission, which has more authority really than our restatement because it has a statutory mandate to analyze the law and report on it. The British Law Commission, in its position paper 151, published in 1998, specifically says that it said, A, wrongful imprisonment is a continuous tort. B, that each temporal element of the continuous tort is a fresh course of action. And finally, as to the whole idea here of holding, saying that the case is untimely filed, it said, In a continuous tort, even if the first temporal segment can be said to be stale, as long as any element of it is still timely within the statute of limitations, then you've got a timely course of action. So in answer to your honor, I point out the Eleger case, and second, the position of the British law, which we say governs under choice of law principles as to liability in that journal, clearly says that you can actually, in a continuous tort, treat each temporal element, quote, and I quote now, as a fresh course of action. So then why, if he's been marched 400 yards away and kept there a while, and half an hour has elapsed, if that satisfies the prior elements and the activity also, because he has, quote, physically separated himself from the aircraft, and therefore, getting past this control element, why can't you say, okay, that constitutes disembarkation, and thereafter, since the continuous tort, and it's still continuing, that's actionable. And one more thing, if I may, on that, in answer to your question, your honor, and I don't want to part my time here, but it's crucial. We have, in the court below, and in our briefs here, pointed out that in the terminal, a totally new government for this course of action arose, that had nothing to do with what happened on the aircraft, namely, that under British law, which is very strict on this, Delta clearly failed to surrender the doctor to law enforcement agencies in the terminal in a timely fashion. So, I think that's all I have to say. Thank you. Thank you, Mr. Herman. You've reserved some time. Thank you. Good morning, your honors. May it please the court. My name is Christopher Duggan, and I am here for Delta. Mr. Hermanson started his argument today with something that happened substantially after the original accident, and the original claim in this case, which all happened on board. In his amended complaint, which you can find in the record appendix, specifically on page 32 through 34, Mr. Hermanson outlines in 13 separate paragraphs all of the instances that the plaintiff alleges constitute injury and what happened to Dr. Dagi as the plane was still in the air and in the process of descent. He also then goes on from there for the next, I think, seven or eight paragraphs, talking about what happened to Dr. Dagi after the plane landed. Now, in brief, on page four of his brief, he says that Dr. Dagi had to stay in the aircraft while everybody else departed. But in the amended complaint, he alleges that Dr. Dagi was ordered to stay on the plane until everybody got out. And that was pointed out by Judge Woodlock below as well. Because the point here is, what's the first, what's the accident? Something that is an incident that happens outside of the person involved, in this case Dr. Dagi. And that is what happened on the aircraft. And if something that happens on the aircraft forms the accident, it's clearly preempted under the convention. The next part is, was he ever able to disembark? And the answer to that question, as Judge Woodlock found below, is no. He was always in some process of disembarkation from there all the way up until approximately an hour later, when the British police, according to the amended complaint, had some contact with the Delta people and then gave the phone to Dr. Dagi and then told Dr. Dagi he could leave. Up until that point, according to the amended complaint, every single thing that Dr. Dagi did was controlled, was under the order of, and was, in Judge Woodlock's verbiage, in the curtilage of the aircraft. Nearby the vicinity of the aircraft. That is exactly what the Warsaw Convention first and then the Montreal Convention later was designed. Suppose they had taken him out the front door of the terminal. Would he still be disembarking at that point? You're asking if they had actually escorted him under guard and controlled him all the way out? Yes. I suppose they had taken him to the police station personally, delivered him to the police station. Is he still disembarking? Yes, I would think he would still be disembarking because the point of disembarking... Suppose they spent a few weeks at a hotel before they took him to the police station. Still disembarking those weeks? I suppose, Your Honor, that's, by the way, exactly what the feeding case is dealing with right now up in the Ninth Circuit. But when the district court found the answer to that question was yes, by the way, it was ten months. But, I mean, there probably comes a time when you sort of weigh all of these factors and say, well, that may be too much. Why? The logic of your position, I don't think, admits of that limitation on it, which doesn't mean it's wrong. I don't see how the position you're taking, which starts with the key point that he was ordered to stay when he was on the plane and never left their control because of something that happened on the plane, if the idea is that's the accident. That's correct, Your Honor. It can't stop being an accident until they relinquish control. I think that that's correct, Your Honor. Okay. And I said that's what the issue is on the Ninth Circuit right now in feeding. But, you know, Judge Woodlock, in his opinion, or in his comment on the argument. So if that's one position, what in the word accident precludes us from reading accident to take account of it being a continuing violation and that even though there was a seizure at that point, there's also a seizure at every other moment. And the seizure we're looking at in the plane that's now before us is the seizure that occurred 30 minutes later, 400 yards away. What's wrong with that argument? Well, a couple of things are wrong with that. First, Your Honor, is the whole purpose of the Warsaw Convention and then the Montreal Convention is to have uniform rules so that everybody, both passengers and airlines in particular, can rely on them and know what they're looking for. This would be a uniform rule with quite everybody. Continuing violation, we look at the continuing violation at the moment the claim seeks to get damages for it. That's uniform to everybody. And if it's 30 minutes later, 400 yards away, put it this way. Suppose Dr. Doggie here was wandering down the hallway and happened to be right next to the room. No one ever said anything to him. He left the plane, great having you on the flight. He walks down the hall, 40 yards away, took him a half hour to get there. He's right in front of that room. All of a sudden, that Delta employee runs up to him and says, they just told me you stole the briefcase. Go in that room. At that moment, they'd have control over him. He'd be 400 yards away. It would be a half hour later. Would you say that claim would be preempted? Well, Your Honor. Would you say that claim would be preempted? The answer is I don't know under the case law. It would be helpful if you had a view. Does it not matter to your position? It doesn't matter to my position because... Suppose I say we're going to decide the case on the assumption that that would not be preempted. Could you still win? Absolutely. And the way you would win is by saying that because he was seized early on, it doesn't matter how much longer away it is or how far, even though there would be no claim that he was disembarking if he was seized for the first time, a half hour later, 400 yards away. Well, that's true because... I'm sorry, Your Honor, if I misunderstood your question. That is true because then he would have disembarked by definition. He would already have been away from the control and outside of the general area of the aircraft in a free agent. The cases talk about the term, is he a free agent? And a lot of those are in the baggage area, baggage household area. In that case, he would be a free agent. In this case, and that's the distinction, he never was a free agent. So that means the logic of your position is they could hold him for 10 years. The logic of my position is probably true, but I think the answer is probably not. And for a number of reasons, it's never going to happen, right? You just said in the Ninth Circuit they got somebody for 10 months. They had him for 10 months in something in Ireland. And the court ruled there that he was still in the process of disembarkation, and therefore the Montreal Convention applied. So disembarkation, in your view, has no relationship whatsoever to the distance from the airplane? Well, under McCarthy Day analysis, they break up that tripartite, that three-pronged test. And the time between actually getting off the plane. Yes, but the planning is not the same as disembarkation under the Convention. And it's not even just disembarkation. It's any operation of disembarkation. Those words were chosen carefully by the framers in Warsaw back in 1929 when they had to try to figure out whether it was going to be a portal-to-portal thing or something else. And they came up with that phrase. So it was more than just traveling from here to there. Suppose they ordered him to stay on the plane, and they actually never let him get off the plane for weeks. You would say it's then clear that the Convention applies in reality? Absolutely. So you say effectively this is no different than that? Exactly right. And that was the point I was going to make, that whether he's there, and Mr. Hamilton would concede that when he has conceded it, or they took him inside for whatever reason. Maybe they needed to rebook the aircraft so it was up on flight. He's still under the complete control, having surrendered his passport, having been totally under the control of some Delta person, allegedly anyway, until the police officer came. So whether it happened that hour on board, or in the jetway, or just outside of the jetway, or marching down 400 yards, it does not matter at all. So in this three-pronged test, you're saying that the only thing that matters is control? No, I'm not saying the only thing that matters is control. But what I can tell you is this, is the thing that Mr. Hamilton wasn't quite right about was that what the framers would have thought about the word control, because they didn't deal with it. That comes out of McCarthy and Gay analysis. And so the tripartite test that this court adopted in McCarthy was a way of framing, nothing more than a way of framing the analysis. But even in McCarthy, the McCarthy court talks about how control is inextricably intertwined with all of the other elements that they have to... But you're saying once control occurs in a situation in which time and location also point towards it being an accident, that it's governed by the convention. It shouldn't. As long as the control is not relinquished, it continues to be preempted. Certainly. But if control is exercised for the first time after there's been disarticulation, then control can't be determined. Absolutely true. That's exactly right. And what's your best authority for that, the way we should treat with it? They say on the jar, cuts the other way. You said there's a district court case in California that says, The Theody case adopts your position? Yes. And that's on appeal right now in the Ninth Circuit? In the Ninth Circuit, yes, Your Honor. But it's even more than that. For example, if you look at the Hernandez case here, footnote four, talks specifically about control as being important. And if you never relinquish control, that's when the convention disembarkation would still apply. That's basically the underlying theme in McCarthy Day as well. And of course, in Day and Evangelistos, which were embarkation cases, but those also go to the same point. The courts have used disembarkation and embarkation, used them similarly, because they're in the same section. They noted that because the people were in a secure area, they were just about to get on, they had done everything they needed to do, when the terrorist attack hit, they were within the control and within the scope of the Warsaw Convention, and therefore the Warsaw Convention applied. Here, the same thing applies, except in reverse, because Dr. Daugherty was never allowed, according to the medical plate, to get off the plane. Is there another question? Do we have any definition or anything to look at as to what constitutes disembarkation apart from these three factors? Does that question make sense? In other words, I think the key to your argument is some notion that he, because he never was allowed to get off in the normal way, he never disembarked. He's always in the process of disembarkation. In fact, they don't want him to disembark, because they want to make sure that he gets into the right hands. Correct. So, from that perspective, is there any definition or anything I can look to about what disembarkation entails? Because one might think that just time passes. At a certain point, it's just not plausible to think you haven't disembarked. I'll cut to your 10-year hypothetical, Your Honor, so I agree with that. The answer to your question is not really, and the reason is that when the framers in Warsaw tried to deal with this, they had a number of different options. Remember, there's 103 signatories now to this convention. And so what they're really trying to do is to get a uniform rule that all the airlines can understand, can protect the airlines on the one hand, and give potential injured passengers some way to recover on the other. But they came up with the phrase, in the process of embarkation or disembarkation, as a compromise during a meeting in Warsaw in 1929, and it has been adopted.  It never left the physical clutches of someone in the airline. I saw something that indicated that not every signatory agrees with the idea that an intentional tort like this constitutes an accident. Is that right? Not as far as I know you, Your Honor. If you have, I'd be happy to consider it. But as far as I know, all of the 103 signatories have adopted and abide by this convention. No, no. In terms of whether an accident encompasses an intentional tort like this. Oh, I see your idea. Because one reason this is coming up, in a typical accident it's over. A negligent type thing, a slip and fall, those type of things you wouldn't have this issue of the continuation of the tort. The continuing tort is likely to be intentional, I would imagine. And the word accident is just a non-obvious word to capture some intentional action like that. That's ongoing. That's probably true. In part, remember, the document is drafted in French, so that's one of the issues that we have here. The other issue is that they were trying to deal with the, there are both common law countries and civil law countries, so they're trying to deal with concepts that cross both of those lines. And so, I don't know the answer to that. Have we ever held that this tort is an accident? This tort is definitely, intentional torts, the client alleged, are definitely accidents. Because it falls within, I don't know if this court has, but I think the Supreme Court has. I don't think there's any doubt about that under the convention. Because, oh, I see my time is up. Just to ask the question slightly differently, has that been an issue in this case? No, no. No, I think everybody agrees that this was an accident, whatever happened. No, there was something that happened, happening that was external to the passenger and unexpected. And so that's why the accident. But even if that has not been raised as an issue, if it is a legitimate issue, it might possibly inform how we would interpret all of this. So I guess it's not entirely off the table. But thank you. Thank you, Your Honor. Your Honors, I'd like to briefly comment on a couple of points, Mr. Duggan. First, I think there's a crucial decision on the Supreme Court that hasn't been brought up here today in all argument. It's Seng, T-S-E-N-G, versus A-L-L, its allies. And the Supreme Court specifically held that the preemptive effect of the convention cannot extend further than its own substantive scope. The Court also defined the substantive scope, and that's been affirmed by this Court, though according, Seng, that where disembarkation is involved, the substantive scope ends at the point of disembarkation. If this Court believes that the distance, the facials, the temporal, and the activity element have been satisfied, then the substantive scope of the convention ends at that second location where Dr. Duggan was held, and the subsequent continuous Court is actionable under local law. And one more thing, though, about this trial test that I think is worth mentioning before I conclude. This Court, in the first time it's ever adopted that, originally, in its first decision, this Court, in the McDonald case, defined disembarkation very simply in a common-sense fashion. It says disembarkation is when you reach the safety of the terminal. In the subsequent case, Martinez-Hernandez, the Court said that the triad case may be helpful in closed cases. It did not overrule or rescind McDonald. So in closing, I ask this Court to consider, is this even a closed case if the appellant was being held 400 yards away from the aircraft, was half an hour off the aircraft, and his activity had fully satisfied, in the words of this Court, his physical separation from the aircraft? Is this even a closed case that should even involve the other element of the triad? Thank you. Thank you. All rise. Thank you.